# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| LINDA KOVACH, et al., | ) | CASE NO. 5:15-cv-616 |
| | ) | |
| | ) | |
| PLAINTIFFS, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| ACCESS MIDSTREAM PARTNERS, L.P., | ) | |
| et al., | ) | |
| | ) | |
| DEFENDANTS. | ) | |

Before the Court are a motion to dismiss filed by defendant Access Midstream Partners,

L.P., n/k/a William Partners, L.P. ("Access Midstream") (Doc. No. 19 (motion) and Doc. No. 19-

1 (memorandum in support ["Access Midstream MTD"])), and a motion to dismiss filed by

defendant Chesapeake Energy Corporation ("Chesapeake") (Doc. No. 21 (motion); Doc. No. 20

(memorandum in support ["Chesapeake MTD"])). Plaintiffs have filed a response to each motion

(Doc. No. 27 ("Opp'n Access Midstream MTD"); Doc. No. 26 ("Opp'n Chesapeake MTD")).

Defendants have each filed a reply in support of their respective motions (Doc. No. 34 ("Access

Midstream Reply"); Doc. No. 35 ("Chesapeake Reply")).

## I. BACKGROUND

The facts are taken from plaintiffs' First Amended Complaint ("FAC"). (Doc. No. 1-3, at

110.[1]) Chesapeake "is the second largest producer of natural gas in the United States." (FAC ¶

13.) Its operations are focused on the "development of onshore unconventional and conventional

---

[1] All page references are to the page identification number generated by the Court's electronic docketing system.

natural gas, especially through the use of hydraulic fracturing, or 'frac[k]ing,' in various shale formations throughout the United States . . . ." (*Id.*) The process of fracking has been relied upon increasingly since the early 2000's as a means by which gas exploration corporations ("E&P companies"), such as Chesapeake, can access large deposits of natural gas trapped in shale formations. Two of the largest such formations in the world are the Marcellus Shale and Utica Shale formations located "in and beyond Ohio[.]" (*Id.* ¶ 16.) Plaintiffs own the mineral rights to land in Ohio that is situated over these two formations. (*Id.*)

In order to access these formations, E&P companies enter into leases with the owners of the mineral of rights to these lands, such as plaintiffs. Pursuant to these agreements, E&P companies agree to shoulder the expense and risk of extracting the oil from the shale formations, and, in return, the mineral owners receive a royalty, which usually represents a percentage of the proceeds from the sale of the oil. The mineral rights owners benefit from this arrangement as they seldom have the expertise or the capital to engage in fracking. (*Id.* ¶ 17.)

The expenses associated with bringing the oil to the surface are referred to as "production" costs. These costs are not shared by the mineral rights owners. After the gas is brought to the surface, it must be converted into a marketable condition so that it can move through the interstate pipeline and to the ultimate customer. Specifically, the gas must be purified into "pipeline quality" natural gas. These "post-production" processes, also referred to as "midstream services," usually include some combination of "gathering," "treating," "compression," and "processing." "Gathering" refers to collecting the gas from multiple wells and funneling it into a small intermediary pipeline. "Treating" pertains to the removal of impurities from the gas, "compression" involves boosting the pressure of the gas stream to bring it into line with the pressure maintained in the interstate pipeline, and "processing" refers to the

steps taken to separate out the various parts of the gas stream for separate sale. (*Id*. ¶¶ 18, 19.) Depending on the terms of the lease, the cost of these midstream processes may be shared by the mineral rights owner. (*Id*. ¶ 18.)

Plaintiffs are parties to one of two types of leases with subsidiaries of Chesapeake. In exchange for the right of these subsidiaries to extract gas and oil from the property, the leases promise plaintiffs a royalty, which is based upon the price the subsidiaries actually realize for the sale of the oil and gas. The first lease, the Anschutz Exploration Lease, does not allow for deductions from the royalty payments. The second lease, the Chesapeake Exploration Lease, allows deductions for "the *cost* to transport, treat and process the gas[.]" Neither lease permits "deductions in excess of actual cost or which are unreasonable." (*Id*. ¶¶ 46-48, emphasis in FAC.)

In 2010, Chesapeake was in financial distress, due to significant capital expenditures and a drop in gas and oil prices, and was in desperate need of a quick infusion of cash to satisfy its debts and continue its operations. (*Id*. ¶ 21.) The FAC alleges that Chesapeake, in response to its dire financial situation, devised a fraudulent scheme whereby it would secure much needed cash by improperly withholding royalties owed to plaintiffs. (*Id*. ¶¶ 80, 82.) It is this alleged fraudulent scheme that is at the heart of the present litigation.

The plan was put into motion, on August 3, 2010, when Chesapeake created Access Midstream "and began to spin off its midstream assets, which included its natural gas gathering and intrastate pipeline operations, through a series of sales to Access Midstream in order to fund its ongoing operations." (*Id*. ¶ 22.) Plaintiffs allege that, by this time, Chesapeake was already using its subsidiaries to artificially inflate the costs deducted from landowners' royalties. (*Id*.)

"In December 2011, Chesapeake completed the sale of Appalachia Midstream Services,

L.L.C. ('AMS'), a wholly owned subsidiary of Chesapeake Midstream, and AMS's Marcellus Shale midstream assets for $865 million in total consideration." (*Id*. ¶ 23.) In February 2012, Chesapeake announced that it would sell additional midstream assets to fund anticipated capital expenditures in 2012 and provide additional liquidity for 2013. (*Id*. ¶ 24.)

On December 20, 2012, Chesapeake sold its subsidiary, Chesapeake Midstream Operation, L.L.C, to Access Midstream, including the midstream assets used in connection with the Marcellus and Utica Shale operations. (*Id*. ¶ 25.) As a part of this asset sale, Access Midstream received a 49% interest in Chesapeake's subsidiary, Utica East Ohio Midstream, L.L.C., which owns "infrastructure for gathering, processing and fractionation" of gas in the Utica Shale formation located in Eastern Ohio. (*Id*.)

At the time of the asset sales to Access Midstream, Chesapeake named J. Michael Stice ("Stice"), (the President and Chief Operating Office of Chesapeake Midstream and Senior Vice President of Natural Gas Projects for Chesapeake) as the Chief Executive Officer of Access Midstream. (*Id*. ¶ 26.) Domenic Dell'Osso, Jr. (Executive Vice President and Chief Financial Officer of Chesapeake) served with Stice as directors of Access Midstream's general partner, Access Midstream GP, L.L.C. (*Id*. ¶¶ 27, 28.) Access Midstream also received from Chesapeake the guarantee that Chesapeake personnel would be made available to assist with the transition and that going forward certain services would be provided to Access Midstream. "Notably, Access Midstream is managed and directed by former and current Chesapeake officers, has made extensive use of other Chesapeake employees in conducting its operations, and continues to pay Chesapeake and other affiliates and subsidiaries for a variety of services." (*Id*. ¶ 30.)

Following the acquisition of Chesapeake's midstream assets, Access Midstream replaced Chesapeake Midstream as the beneficiary of certain contracts and entered into gas gathering

agreements with several of Chesapeake's subsidiaries. Pursuant to these gas gathering agreements, Chesapeake's subsidiaries agreed to pay Access Midstream for certain midstream functions, including gathering and transportation. Access Midstream agreed, in turn, to tie itself to services and equipment provided by Chesapeake's subsidiaries. These services were described in the various agreements as "a cost-of-service based fee." (*Id*.¶ ¶ 31-33, 80.) One such gathering agreement at issue in this litigation, the Marcellus Gathering Agreement, provided for a 15 year term during which Access Midstream was guaranteed an annual rate of return of 15%. (*Id*. ¶¶ 35-36.) Additionally, plaintiffs allege that the agreements with Access Midstream allow certain of Chesapeake's affiliates to recover "a rebate of some of the monies they will pay out to Access Midstream in the form of payments for services and additional assets." (*Id*. ¶ 29.)

In September 2013, Chesapeake reported to its investors that "its expenses related to pipeline and marketing business roughly doubled in the months after it sold certain pipelines and that its revenues for that part of the business also increased accordingly, covering the new costs." (*Id*. ¶ 51.)

According to the FAC, the asset transfer to Access Midstream was a smoke screen designed to position Chesapeake to be able to reverse its financial trouble by dipping into royalties owed to plaintiffs and other mineral rights owners and permitting Access Midstream to benefit in the process. The FAC explains the alleged fraudulent scheme between Chesapeake and Access Midstream that followed:

> . . . Chesapeake took its practice of creating affiliates to appropriate a disproportionate share of production revenues at the expense of royalty owners to another level by spinning-off one of its midstream affiliates, now Access Midstream, selling its remaining midstream assets to the former affiliate, and then colluding with the now separate entity to secure an off-balance sheet loan repaid on the backs of the royalty owners by withholding sale proceeds under the guise of inflated post-production costs. The depth of the collusive relationship amongst the Defendants is further illustrated by the fact that Access Midstream agreed to

5

tie itself to services and equipment provided by other Chesapeake affiliates as a means to shield Chesapeake from incurring the full extent of the costs withheld from the royalty owners' payments.

(*Id.* ¶ 80.)

Plaintiffs allege that Chesapeake's ability to guarantee Access Midstream what it represents as an "above market" rate of return depends on its subsidiaries to pay "supra-competitive" prices for Access Midstream's gathering and transportation services. Plaintiffs further allege that these costs are then shifted to them, and other mineral rights owners, in the form of inflated "cost-of-services fees" deducted from the royalty payments. (*Id.* ¶¶ 37-39.) Plaintiffs allege that these deductions were "inflated, improper, completely unrelated" to Access Midstream's true gathering and transportation costs, and "did not serve to enhance the marketability of gas, . . . instead, merely served to enrich the co-conspirators who devised the scheme." (*Id.* ¶ 43.)

On August 28, 2014, plaintiffs filed their Class Action Complaint (Doc. No. 1-3, beginning at 15) in the Court of Common Pleas in Carroll County, Ohio, seeking to represent themselves and the following class:

> All royalty owners whom [sic] have received royalty payments on natural gas or other hydrocarbon production from wells located in Ohio from Chesapeake Appalachia, Chesapeake Operating Inc[.], and/or Chesapeake Exploration LLC, during the period August 3, 2010 through the present and where deductions were taken from such royalty owners' royalty payments.

(FAC ¶ 67.)

On March 30, 2015, defendants removed the action to federal court. The basis for the removal was federal question jurisdiction, pursuant to 28 U.S.C. § 1331, inasmuch as the state court complaint contained claims arising under the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968. (Doc. No. 1 (Notice of Removal) ¶¶ 1-2.) The removal

notice further provided that supplemental jurisdiction for the state law claims was available under 28 U.S.C. § 1367(a). (*Id.* ¶ 3.)

The FAC raises five causes of action. The first cause of action purports to set out a civil RICO violation under § 1962(c) by which plaintiffs allege that an enterprise, comprised of defendants and their respective officers and directors, was formed for the purpose of facilitating a scheme to defraud plaintiffs and other mineral rights owners through unwarranted deductions from the royalties owed to plaintiffs. The conduct that serves as the basis for this fraudulent scheme alleged in the first claim was and continues to be furthered through acts of mail fraud, wire fraud, and honest services fraud, constitutes a pattern of racketeering. The second cause of action alleges a conspiracy to violate RICO, under § 1962(d), and relies on many of the same allegations of wrongdoing identified in the substantive RICO claim.

The FAC also asserts numerous state law claims. The third cause of action raises a claim for unjust enrichment and asserts that defendants wrongfully benefited from the improperly inflated midstream services costs. In the fourth cause of action, plaintiffs allege that defendants wrongfully converted plaintiffs' property to their own use. The fifth claim asserts a claim for civil conspiracy under Ohio common law, again relying on complaint allegations that defendants "conspired and combined with each other, and with third parties, to make wrongful deductions from leaseholders' royalty payments[.]" (FAC ¶ 123.) The sixth[2] and final cause of action raises a claim for tortious interference with contract and alleges that defendants "negotiated [a] disguised loan asset sale with the knowledge and intent that the loan proceeds will largely be repaid through withholdings of royalties owed Plaintiffs and the Class and with the knowledge

---

[2]The FAC contains two claims identified as the "Fifth Cause of Action" (Civil Conspiracy and Tortious Interference with Contract).

that such withholdings constitute a breach of the terms of the Plaintiffs' and Class' leases with one or more of Chesapeake Appalachia, Chesapeake Operating Inc., Chesapeake Exploration, L.L.C., and/or CHK Utica L.L.C." (*Id*. ¶ 130.)

## I.    STANDARD OF REVIEW

Defendants bring their motions to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. In reviewing a complaint in the context of a motion to dismiss under Rule 12(b)(6), the Court must construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded material allegations in the complaint as true. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).

The sufficiency of the complaint is tested against the notice pleading requirements of Fed. R. Civ. P. 8(a)(2), which provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Although this standard is liberal, Rule 8 still requires a complaint to provide the defendant with "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true," to state a plausible claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.'" *Id*. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief[.]'" *Id*. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). In such a case, the

plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [and the] complaint must be dismissed." *Twombly*, 550 U.S. at 570; *see Iqbal*, 556 U.S. at 683 (citation omitted).

A complaint need not set down in detail all the particulars of a plaintiff's claim. However, "Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79 (This standard requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. at 678 (citing *Twombly*, 550 U.S. at 555); *see Gregory v. Shelby Cnty.*, 220 F.3d 433, 446 (6th Cir. 2000) (the court should not accept conclusions of law or unwarranted inferences couched in the form of factual allegations). The complaint "must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory." *Scheid v. Fanny Farmer Candy Shops, Inc*., 859 F.2d 434, 436 (6th Cir. 1988) (emphasis in original) (additional citations omitted), *abrogated on other grounds*, *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 121 S. Ct. 1835, 149 L. Ed. 2d 855 (2001)).

Because plaintiffs' federal "RICO claims require proof of mail or wire fraud as an element, the plaintiffs must also satisfy the heightened particularity requirements of Federal Rule of Civil Procedure 9(b) with respect to the elements of fraud. 'Rule 9(b) states that [i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.'" *Jackson v. Segwick Claims Mgmt. Servs., Inc*., 699 F.3d 466, 475 (2012) (quoting *Heinrich v. Waiting Angels Adoption Servs., Inc*., 688 F.3d 393, 403 (6th Cir. 2012)). "This includes alleging the 'time, place, and content' of the fraudulent acts, the existence of a

fraudulent scheme, the intent of the participants in the scheme, and 'the injury resulting from the fraud.'" *Jackson*, 699 F.3d at 476 (quoting *Heinrich*, 688 F.3d at 403); *see Bender v. Southland Corp.*, 749 F.2d 1205, 1216 (6th Cir. 1984) (upholding the district court's dismissal of RICO claims where the complaint failed to plead fraud with adequate particularity).

Rule 9's pleading requirement of particularity must be read in harmony with Rule 8's "policy of simplicity in pleading[.]" *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 679 (6th Cir. 1988) (citing Fed. R. Civ. P. 8). Accordingly, courts should not be "too exacting" or "demand clairvoyance from pleaders" in determining whether the requirements of Rule 9(b) have been met. *Id.* at 681. Rather, "if the defendant has fair notice of the charges against him, [Rule 9(b)] is satisfied." *Shapiro v. Merrill Lynch & Co.*, 634 F. Supp. 587, 594 (S.D. Ohio 1986); *see Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 803 (6th Cir. 2012) ("'Rule [9] requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim.'") (quoting *Michaels Bldg.*, 848 F.2d at 680).

In entertaining a Rule 12(b)(6) motion, a court may consider documents that are referred to in the pleadings and are integral to the claims without converting the motion to one for summary judgment. *See Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (citing *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)); *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 335-36 (6th Cir. 2007) (citation omitted); *see also Weiner v. Klais & Co., Inc.*, 108 F.3d 86, 89 (6th Cir. 1997) (court may consider documents that govern a party's rights and are necessarily incorporated by reference in the complaint on a motion to dismiss) (citations omitted).

## II.  DISCUSSION

In their motions to dismiss, defendants maintain that the allegations in the FAC fail to state a cause of action under federal or state law. Defendants further posit that the fraud allegations are not pled with sufficient particularity to satisfy the heightened pleading requirements of Fed. R. Civ. P. 9(b).

### A.  RICO § 1962(c)

Chesapeake underscores the fact that plaintiffs' federal RICO claims rest almost entirely on a 2014 Internet article written about the plight of mineral rights owners in Pennsylvania who leased their property to Chesapeake for gas and oil exploration. It complains that plaintiffs failed to conduct an independent investigation prior to filing suit, and simply relied on the allegations contained in the article without any inquiry into whether the allegations, even if true, even applied to them, mineral rights owners in Ohio. (Chesapeake MTD at 305.)

It is true that plaintiffs cite as the source of many of their allegations a March 13, 2014 internet article written by *ProPublica*, a non-profit organization engaged in investigative reporting.[3] (*See, e.g.*, FAC ¶ 2, citing *ProPublica, Chesapeake Energy's $5 Billion Shuffle*, available at http://propublica.org/article/chesapeake-energys-5-billion-shuffle) ("*ProPublica* Article") (visited Feb. 10, 2015)). The article detailed the business dealings between defendants and Chesapeake's various subsidiaries, including the asset transfer sales, the gathering agreements that followed, the incentives received by Access Midstream and Chesapeake's

---

[3] The FAC provides that *ProPublica* "has been awarded two Pulitzer Prizes and a Peabody Award (the highest honor in broadcast journalism) in 2013. See http://www.propublica.org/awards/, last accessed August 24, 2014. Moreover, *ProPublica's* investigations have been cited by federal courts when evaluating the sufficiency of plaintiffs' pleadings." (FAC ¶ n.1, citing, as example, *Garden City Employees' Ret. Sys. v. Psychiatric Solutions, Inc.*, No. 3:09-00882, 2011 WL 1335803, at *27 (M.D. Tenn. Mar. 31, 2011) (noting allegations based on *ProPublica's* investigation).)

subsidiaries, and the resulting impact on the royalty payments to Pennsylvania land owners. Though the article focused on one particular Pennsylvania resident, farmer Joe Drake, it identified other Pennsylvania landowners who, like Joe, saw their royalty payments decrease substantially after the purported self-dealing of defendants. The article represented that its author "pieced together the story of how Chesapeake shifted borrowing costs to landowners from documents filed with the U.S. Securities and Exchange Commission, interviews with landowners, people who worked for [Chesapeake] and employees at other gas and oil concerns." *ProPublica* Article at *2.

The article is prominently referenced throughout the FAC and is cited as the source for many of the factual allegations relating to the business arrangements between defendants and Chesapeake's subsidiaries. Plaintiffs also include in the FAC numerous quotes from the article, culminating with a quote from an "'executive at a rival company who reviewed the deal at ProPublica's request [and] said it looked like ***Chesapeake had found a way to make the landowners pay the principal and interest on what amounts to a multi-billion dollar loan to the company from Access Midstream***.'" (FAC ¶ 34, quoting *ProPublica* Article, all emphasis in FAC.)

Plaintiffs also reproduce from the article opinions from industry analysts who were "at a loss to explain" Chesapeake's September 2013 report to investors regarding its increased midstream costs and revenue. Specifically, the FAC provides:

- Fadel Gheit, a seasoned industry analyst for the investment firm Oppenheimer, who estimated the figure was off by a decimal point before later confirming that it matched the numbers Chesapeake had reported to the SEC, stated, "[s]omething is wrong with this calculation . . . It can't be."

- Kevin Kaiser, a financial analyst with Hedgeye, a private equity group in New York, stated, "[t]he change in marketing, gathering, compression

> revenue and expense is staggering."

- None of the financial analysts who cover Chesapeake that ProPublica spoke with could explain the explosion in Chesapeake's marketing and transportation revenues and expenses using oil sales alone.

(FAC ¶ 52, citing *ProPublica* Article.)

The Court finds that plaintiffs can rely on the facts contained in the article relating to business arrangements between defendants and Chesapeake's subsidiaries.[4] The article cites SEC filings and other public records as the source of many of these allegations. Courts have held that plaintiffs can rely on news articles from trusted sources to satisfy Rule 9(b) pleading requirements, as well as Rule 11 pre-filing investigation requirements.[5] *See, e.g., Kamerman v. Steinberg*, 113 F.R.D. 511, 514-15 (S.D.N.Y. 1986) (rejecting argument that plaintiffs could not rely on newspaper articles to plead fraud with particularity and to meet Rule 11 pre-filing investigation obligations).

Permitting plaintiffs to rely on relevant articulable facts involving the non-public dealings alleged is also appropriate at this stage in the proceedings, as they represent matters that are within defendants' control. In *Williams*, plaintiffs alleged that Duke Energy, through subsidiaries and an affiliated company, "paid unlawful and substantial rebates to certain large customers, including General Motors, in exchange for the withdrawal by said customers of objections to a

---

[4]Chesapeake suggests that documents referenced in the FAC show that Chesapeake and Access Midstream did not enter into services agreement for the wells servicing plaintiffs' property. (Chesapeake MTD at 307.) In support, it cites a statement made by Access Midstream in a Form 8-K document, dated December 26, 2012, denying the existence of any such agreement. According to Chesapeake, this representation is fatal to plaintiffs' fraud claims. Plaintiffs counter that they are not in a position to determine the truth of any such statement by Access Midstream, or determine which of the midstream service agreements support plaintiffs' wells. (Opp'n Chesapeake MTD at 370.) The Court agrees with plaintiffs that, at this stage of the pleadings and given the fact that this information is largely in the control of defendants, it would be inappropriate to reject these allegations as legally sufficient. This is the very type of inquiry that is properly reserved for discovery.

[5] Rule 11 of the Federal Rules of Civil Procedure provides, in part, that in filing a pleading with the Court, counsel certifies that "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery[.]" Fed. R. Civ. P. 11(b)(3).

rate-stabilization plan that Duke was attempting to have approved[.]" *Williams*, 681 F.3d at 793. Rejecting defendants' argument that plaintiffs had failed to plead fraud with particularity because they had merely relied upon lawful transactions to support their fraud claims, the Sixth Circuit explained that "'[i]t is a principle of basic fairness that a plaintiff should have an opportunity to flesh out her claim through evidence unturned in discovery. . . . Especially in a case in which there has been no discovery, courts have been reluctant to dismiss the action where the facts underlying the claims are within the defendant's control.'" *Id*. at 803 (quoting *Michaels Bldg*., 848 F.2d at 680). Ultimately, the court concluded that the facts, as alleged, set forth the fraudulent conduct with sufficient particularity to put defendants on notice of the clams. *Id*.

Plaintiffs have cited no authority, however, that would permit them to use opinions from competitors and others to articulate factual allegations, though they can rely on the articulable facts that purport to undergird those opinions. Additionally, defendants are correct that plaintiffs cannot rely on facts relating to any injuries the Pennsylvania mineral rights owners sustained as factual allegations supporting their injuries, and, indeed, the FAC does not attempt to do so. Thus, the question this Court must answer is whether the allegations plaintiffs have alleged in the FAC, regardless of their origin, sufficiently set forth a claim for fraud under RICO.

In order to demonstrate a RICO violation under § 1962(c), a plaintiff must establish the following elements: (1) the existence of two or more predicate offenses; (2) the existence of an "enterprise;" (3) a nexus between the pattern of racketeering and the enterprise; and (4) an injury to business or property occurring as a result of the racketeering activity. *VanDenBroeck v. CommonPoint Mortg. Co*., 210 F.3d 696, 699 (6th Cir. 2000) (citing *Frank v. D'Ambrosi*, 4 F.3d 1378, 1385 (6th Cir. 1993)), *abrogated on other grounds, Bridge v. Phoenix Bond & Indem. Co*., 533 U.S. 639, 128 S. Ct. 2131, 170 L. Ed. 2d 1012 (2008); *see Sivak v. United Parcel Serv. Co*.,

28 F. Supp. 3d 701, 719 (E.D. Mich. 2014) (setting forth the elements as "'(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity[]'") (quoting *Moon v. Harrison Piping Supply*, 465 F.3d 719, 723 (6th Cir. 2006)) (further citations omitted).

Plaintiffs plead the existence of traditional mail and wire fraud as predicate acts for their substantive RICO claim. With respect to the use of the mails, defendants allege:

> The conduct of Defendants and their co-conspirators, including but not limited to Chesapeake Appalachia, Chesapeake Operating Inc[.], and Chesapeake Exploration LLC, as described in this complaint, constitutes the execution of a scheme and artifice to deprive oil and gas lessors in Ohio of royalties properly due them by means of fraudulent pretenses and representations through the use of the United States mail, in violation of 18 U.S.C. § 1341.
>
> Their use of the mails formed a central feature of the scheme and included, by way of example and as described above, sending oil and gas lessors royalty statements and royalty payments which reflected deductions for artificially inflated gas gathering and transportation fees pursuant to gathering agreements. Hundreds, and likely many thousands, of such royalty statements and royalty payments have been sent to Ohio royalty owners through the mails and wires across state lines. Each of these statements and payments fraudulently represented that deductions for gas gathering and transportation costs were legitimately incurred and constituted permissible deductions from royalties under the oil and gas leases.
>
> Moreover, Defendants and their co-conspirators, including but not limited to Chesapeake Appalachia, Chesapeake Operating Inc[.], and Chesapeake Exploration LLC. [sic], made fraudulent and untrue statements regarding deductions and volume adjustments for midstream services that were represented to reflect legitimate costs rather than the scheme as alleged herein.

(FAC ¶¶ 54-56.) Similarly, the use of wire transmissions is described as follows:

> In addition, Defendants and their co-conspirators, including but not limited to Chesapeake Appalachia, Chesapeake Operating[.], and Chesapeake Exploration LLC. [sic], have, on a monthly basis, transferred payments between themselves by wire, which payments were made pursuant to the non-arm's length and conspiratorial agreements described herein. This conduct constituted multiple violations of wire fraud, 18 U.S.C. § 1343, which is a predicate offense for purposes of 18 U.S.C. § 1962(c).

(FAC ¶ 59.)

Mail fraud consists of "(1) a scheme to defraud, and (2) use of the mails in furtherance of the scheme." *United States v. Jamieson*, 427 F.3d 394, 402 (6th Cir. 2005) (citation omitted). "The elements of wire fraud are essentially the same except that one must use the wires in furtherance of the scheme to defraud." *Heinrich,* 668 F.3d at 404 (citation omitted). "A plaintiff must demonstrate *scienter* to establish a scheme to defraud, which is satisfied by showing the defendant acted either with a specific intent to defraud or with recklessness with respect to potentially misleading information." *Sivak*, 28 F. Supp. 3d at 720 (citing *United States v. DeSantis*, 134 F.3d 760, 764 (6th Cir. 1998)).

"A scheme to defraud includes any plan or course of action by which someone uses false, deceptive, or fraudulent pretenses, representations, or promises to deprive someone else of money." *Jamieson*, 427 F.3d at 402 (citation omitted). With respect to the alleged misrepresentations, Rule 9(b)'s heightened pleading requirements are met where the plaintiff is able to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Frank v. Dana Corp*., 547 F.3d 564, 570 (6th Cir. 2008) (further quotation marks and citation omitted).

The RICO statute provides that an "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity[.]" 18 U.S.C. § 1961(4). The enterprise must be separate from the "person . . . participating in an enterprise's affairs[,]" and thus "a corporation cannot be named as the liable 'person' and simultaneously fulfill the 'enterprise' requirement as well." *Puckett v. Tenn. Eastman Co*., 889 F.2d 1481, 1489 (6th Cir. 1989) (quotation marks and citation omitted). Where, as here, an "association-in-fact" enterprise is alleged, the complaint must set forth three

16

structural features: "'a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.'" *Ouwinga v. Benistar 419 Plan Servs., Inc.*, 694 F.3d 783, 794 (6th Cir. 2012) (quoting *Boyle v. United States*, 556 U.S. 938, 946, 129 S. Ct. 2237, 173 L. Ed. 2d 1265 (2009)). "'Put another way, a plaintiff must show 'simply a continuing unit that functions with a common purpose.'" *Id.* (quoting *Boyle*, 556 U.S. at 948).

To establish a "pattern of racketeering activity," a plaintiff must allege "at least two predicate acts of racketeering activity occurring within a ten-year period[,]" *Moon*, 465 F.3d at 723, and "show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239, 109 S. Ct. 2893, 106 L. Ed. 2d 195 (1989) (emphasis in original). "Continued activity" may be pleaded by demonstrating "a series of related predicates extending over a substantial period of time [i.e., 'closed continuity']", or "past conduct that by its nature projects into the future with a threat of repetition [i.e., 'open-ended continuity']." *Moon*, 465 F.3d at 724 (internal quotation marks and citation omitted).

With respect to closed continuity, it is well settled that a "racketeering activity lasting only 'a few weeks or months and threatening no future criminal conduct' is insufficient." *Moon*, 465 F.3d at 725 (quoting *H.J. Inc.*, 492 U.S. at 242). While the existence of a single fraudulent scheme does not "automatically preclude the finding of a pattern[,]" the Sixth Circuit has found schemes lasting as little as 17 months to be insufficient to support a RICO claim. *Vemco, Inc. v. Camardella*, 23 F.3d 129, 134-35 (6th Cir. 1994) (citation omitted); *see Polzin v. Barna & Co.*, No. 3:07-CV-127, 2007 WL 2710705, at *8 (E.D. Tenn. Sept. 14, 2007) (single fraudulent scheme involving contract dispute did not support a pattern of racketeering).

Finally, a RICO plaintiff must demonstrate that the pattern of racketeering was the proximate cause of his injury. *See Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268, 112 S. Ct. 1311, 117 L. Ed. 2d 532 (1992) (A plaintiff's right to sue under § 1964(c) requires a showing that the defendants' violation was the proximate cause of the plaintiff's injury.); *see also* 18 U.S.C. § 1964(c) (Section 1964(c) provides a private cause of action for "[a]ny person injured in his business or property by reason of a violation of section 1962[.]") The United States Supreme Court has held that "'proximate cause' requires some direct relation between the injury asserted and the injurious conduct alleged." *Holmes*, 503 U.S. at 268; *Heinrich*, 668 F.3d at 404-05 (citation omitted); *see also Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461, 126 S. Ct. 1991, 164 L. Ed. 2d 720 (2006) ("When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries."); *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497, 105 S. Ct. 3275, 87 L. Ed. 2d 346 (1985) (finding, in RICO action based on predicate acts of mail and wire fraud, that a plaintiff's damages must "flow from the commission of the predicate acts").

Having set forth the governing law, the Court must determine whether the FAC has met these pleading requirements. Filtering out the improperly pled opinions and conclusory statements, the Court concludes that plaintiffs have asserted the following articulable factual allegations in support of a RICO fraudulent scheme:

- Chesapeake was in financial trouble in 2010, due to major capital expenditures and falling gas and oil prices, and was in need of cash. (FAC ¶ 21.)

- On August 3, 2010, Chesapeake formed Access Midstream and, through a series of transactions, sold to Access Midstream certain midstream assets and also sold other subsidiaries and their midstream assets to Access Midstream.  (*Id.* ¶¶ 22-25.)

- Chesapeake, Access Midstream, and various Chesapeake subsidiaries

18

share directors, executives, and other management personnel. (*Id.* ¶¶ 26-28.)

- The resulting gathering agreements between Chesapeake's subsidiaries and Access Midstream guaranteed Access Midstream a 15% rate of return. This represented an above-market rate of return, and ensured that Access Midstream would receive $5 billion over 15 years. (*Id.* ¶¶ 31-36.)

- Under these same agreements, Chesapeake and some of its subsidiaries are entitled to a rebate of some of the monies paid to Access Midstream for its gathering services. Also as part of these agreements, Access Midstream agreed to use certain services and equipment provided by the subsidiaries. (*Id.* ¶¶ 29, 80.)

- Revenue from gathering and transporting services provided to Chesapeake constitutes 84% of Access Midstream's business. (*Id.* ¶ 44.)

- In September 2013, Chesapeake reported to investors that its gathering and transporting expenses doubled in the months following the asset sales and that its revenue increased accordingly. (*Id.* ¶ 51.)

- Some of the leases entered into between plaintiffs and Chesapeake and/or its subsidiaries provided for deductions from royalty payments for midstream services, but none of the leases permitted unreasonable deductions. (*Id.* ¶ 48.)

- Chesapeake and/or its subsidiaries regularly sent plaintiffs through the mail royalty payments from which deductions for midstream services were taken. Defendants also exchanged wire transfers of funds on a monthly basis. (*Id.* ¶¶ 55, 59.)

Though it represents a close call, the Court finds that these factual allegations, if believed, are sufficient to establish a scheme to defraud using mail and wire fraud. The close relationship of defendants and their common management, coupled with the above-market rate guaranteed for 15 years and the entitlement to rebates, would support an inference that the transactions did not take place at arms-length and represented an example of collusion. Such a conclusion is further bolstered by Chesapeake's sudden and dramatic increase in both midstream expenses and revenue. Moreover, the use of the mails to send the royalty payments, purportedly containing overstated deductions, was a critical component of the scheme as the deductions

represented the means by which the revenue was realized. The transfers of funds by wire transmissions were also necessary to complete the collusive transactions that made up the scheme. Thus, these allegations, if proven, would allow a trier of fact to draw the reasonable inference that defendants are liable for the misconduct alleged.[6] *See Iqbal*, 556 U.S. at 678 (citation omitted).

Still, defendants complain that plaintiffs have failed to allege with particularity the time, place, and content of the alleged misrepresentations supporting the fraud. *See U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc*., 501 F.3d 493, 504 (6th Cir. 2007) (to comply with Rule 9(b), a RICO plaintiff must "allege the time, place, and content of the alleged misrepresentation") (quotation marks and citations omitted). Where, as here, a complaint alleges "'a complex and far-reaching fraudulent scheme,'" it is sufficient if the pleading offers examples of specific fraudulent conduct as a representative sample. *U.S. ex rel. Marlar v. BWXT Y-12, L.L.C*., 525 F.3d 439, 445 (6th Cir. 2008) (quoting *Bledsoe*, 501 F.3d at 510).

Plaintiffs represent that, "[b]y way of example only, statements sent to Plaintiffs each

---

[6] While the FAC adequately sets forth a fraudulent scheme based on traditional mail and wire fraud, it fails to allege a scheme involving honest services fraud. 18 U.S.C. § 1346 provides that a "'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." In *Skilling v. United States*, 561 U.S. 358, 408-11, 130 S. Ct. 2896, 177 L. Ed. 2d 619 (2010), the Supreme Court held that honest services fraud is limited to "fraudulent schemes to deprive another of honest services through bribery and kickbacks." In the wake of *Skilling*, this court, like many others, has held that honest services fraud requires a fiduciary relationship. *United States v. Dimora*, 829 F. Supp. 2d 574, 593 n.10 (N.D. Ohio 2011) (This Court does not . . . read *Skilling* as distinguishing the need for a fiduciary relationship."); *see, e.g., United States v. Lusk*, No. 2:14-CR-00116, 2015 WL 1808909, at *3 (S.D.W.Va. Apr. 21, 2015) ("Courts that addressed the *Skilling* opinion interpreted it as stating that honest services fraud includes a fiduciary duty requirement.") (collecting cases). In support of the existence of a fiduciary duty, plaintiffs allege that defendants owe "legal duties to render services to lessors." (FAC ¶ 65.) Plaintiffs have failed to allege a legally cognizable fiduciary duty flowing from the lessor/lessee relationship, and courts that have considered the relationship have rejected the notion that any such relationship exists. *See, e.g., Leggett v. EQT Prod. Co*., No. 1:13CV4, 2015 WL 1212342, at *7 (N.D. W. Va. Mar. 17, 2015) ("West Virginia law does not impose a fiduciary duty on lessors and leases in the oil and gas context."); *Waechter v. Amoco Prod. Co*., 537 P.2d 228, 230 syl. 1 (Kan. 1975) ("[a] lessee under an oil and gas lease is not a fiduciary to his lessor"); *Pursue Energy Corp. v. Abernathy*, 77 So. 3d 1094, 1100 (Miss. 2011) ("the relationship that arises under an oil and gas lease between a mineral lessee and the royalty owner is contractual") (citation omitted). Because plaintiffs have failed to allege facts to support a finding that defendants stood in a fiduciary relationship to plaintiffs, they cannot allege a RICO scheme involving honest services fraud.

represent an instance of fraud[,]" inasmuch each of these statements "fraudulently represented that deductions for gas gathering and transportation costs were legitimately incurred and constituted permissible deductions from royalties under the oil and gas leases." (FAC ¶¶ 55, 57.) The Court finds that these allegations sufficiently apprise defendants as to the time, place, and content of the alleged misrepresentations. Further, defendants have knowledge of what deductions were made to the royalty payments and the reason for those deductions. Given no discovery has taken place and the information regarding the deductions is within defendants' control, the Court finds that the misrepresentations have been pled with sufficient particularity. *See Williams*, 681 F.3d at 802-03 (identification of monthly bills sent to customers taking out "mandatory and unavoidable" fees as false representations put defendants on notice of the alleged unlawful misrepresentations); *see, e.g., Franklin v. CitiMortgage, Inc*., No. 1:11-CV-608, 2012 WL 10192, at *7 (S.D. Ohio Jan. 3, 2012) (allegations that mortgagor's delinquency expense charges contained material misrepresentations that those charges were true when, in fact, they were falsely incurred provided sufficient particularity to satisfy Rule 9(b)).

The FAC has also sufficiently pled the existence of an "enterprise." The FAC purports to set forth an "association-in-fact" enterprise "consisting of Defendants, including their respective officers, directors, employees, agents, and direct and indirect subsidiaries[.]" (FAC ¶ 78.) According to the FAC, the companies and individuals constituting the enterprise were associated for the shared purpose of defrauding plaintiffs through unlawfully and wrongfully withheld royalty payments by means of unjustified deductions for midstream services. Further, the enterprise engaged in, and its activities affected, interstate commerce, and the proceeds from the enterprise's activities were distributed to its participants. (*Id*. ¶ 79.) It also pleads the involvement of each defendant in the scheme, including both their relationship to each other and

their specific conduct. (*Id*. ¶ 80.) Further, the FAC provides that the operation of the enterprise is "ongoing" and expected to continue for the life of the gathering agreements. (*Id*. ¶ 81.)

These allegations establish an enterprise that was separate and distinct from the persons and corporations that constitute the enterprise, and that the companies and individuals that comprised the enterprise were associated for the common purpose of enriching themselves at the expense of plaintiffs through fraudulent and unwarranted deductions from royalty payments. The enterprise has an ascertainable structure, and the role of each party played within the enterprise and its ongoing nature, are set forth with sufficient particularity.[7]

Defendants also posit that the FAC fails to establish that they conducted or participated "directly or indirectly, in the conduct of [the RICO] enterprise's affairs[.]" 18 U.S.C. § 1962(c). Participation in the conduct of the enterprise requires proof that the defendant participated in the "'operation or management'" of the enterprise. *Ouwinga*, 694 F.3d at 792 (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 183, 113 S. Ct. 1163, 122 L. Ed. 2d 525 (1993)). It is not enough for defendants to have participated in conduct involving their own affairs; rather, they must have participated in the affairs of the enterprise. *Id*. (citation omitted).

Chesapeake suggests that the allegations of its conduct within the scheme of the enterprise are merely conclusory, and that the only activities identified are those of Chesapeake's subsidiaries. Yet, the FAC clearly pleads that Chesapeake orchestrated the fraudulent scheme to create Access Midstream and funnel loyal Chesapeake officers and directors to Access

---

[7] Access Midstream complains that the FAC fails to provide a factual basis upon which it functioned within the enterprise. The Court disagrees. While Chesapeake orchestrated the creation of Access Midstream and directed the activity of the enterprise, the FAC explains that Access Midstream furthered the goals of the enterprise by colluding with Chesapeake to secure for Chesapeake an off-balance sheet loan and by agreeing to "tie itself to services and equipment provided by other Chesapeake affiliates as a means to shield Chesapeake from incurring the full extent of the costs withheld from the royalty owners' payments." (FAC ¶ 80.)

Midstream for the purpose of securing for itself capital or a loan disguised as deductions to royalty payments. (FAC ¶¶ 22-28, 80, 82.) Additionally, the FAC provides that defendants exchanged monthly accounting information in order to facilitate the inflated deductions. (*Id*. ¶ 87.) Finally, the FAC alleges that Chesapeake used its affiliates and subsidiaries to shield itself from liability for taking unwarranted deductions from plaintiffs' royalty payments. (*Id*. ¶¶ 80, 82.) At the pleading stage, nothing more is required.

Access Midstream also challenges the pleadings as to its conduct, insisting that it did nothing more than "enter into the various agreements, publicly disclose them, and then comply with their terms." (Access Midstream MTD at 290.) Even though Chesapeake is alleged to have orchestrated the fraudulent scheme, including the formation of its co-defendant, "RICO liability is not limited to those with primary responsibility for the enterprise's affairs; only 'some part' in directing the enterprise's affairs is required." *Ouwinger*, 694 F.3d at 792 (citing *Reves*, 507 U.S. at 179). Having some part in the scheme "'can be accomplished either by making decisions on behalf of the enterprise or *by knowingly carrying them out*.'" *Id*. (quoting *United States v. Fowler*, 535 F.3d 408, 418 (6th Cir. 2008)) (emphasis in original). By entering into collusive agreements to overcharge for the midstream assets, agreeing to rebates to the subsidiaries, and further agreeing to use Chesapeake's subsidiaries' services and equipment—all to ensure that Chesapeake recouped portions of the royalties owed to plaintiffs—Access Midstream participated in the operation and management of the enterprise's affairs. (*See* FAC ¶¶ 29, 80, 86-88, 91.)

Defendants also argue that allegations supporting a pattern of racketeering of a continuing nature are missing from plaintiffs' pleading. Noting that the RICO substantive claim involves a single scheme—that of Chesapeake and its subsidiaries to conspire with Access

Midstream to enter into collusive gathering agreements to withhold funds from royalty payments—defendants argue that there is no threat of on-going criminal activity, relying on the Sixth Circuit's decision in *Vemco*.

There, the plaintiff alleged that a contractor devised a fraudulent scheme to misrepresent the guaranteed price in a building contract and extort from plaintiff a higher price. In finding that the scheme was devoid of a threat of on-going criminal activity, the court ruled that plaintiff could not rely on the defendant's conduct in sending out the billing notices over a period of one year to extend the duration of the scheme. In reaching this conclusion, the court relied on the Third Circuit's decision in *Kehr Packages, Inc. v. Fidelcor, Inc*., 926 F.2d 1406 (3d Cir. 1991). *Kehr* also involved a single fraudulent scheme, that one growing out of a leveraged buyout of the plaintiff company. The business transactions constituting the scheme lasted only a few months, and the court held that the plaintiff could not rely on "innocent" monthly invoices to extend the scheme. *Kehr*, 926 F.2d at 1418.

The monthly royalty statements sent to plaintiffs in the instant case cannot be considered innocent mailings, as each one is alleged to have contained a fraudulent misrepresentation regarding the true nature of the deduction for midstream costs. Each statement contributed to the ongoing scheme to fund an undisclosed loan to Chesapeake. *Cf. Kehr*, 926 F.2d at 1414 (noting that "it would be relevant if particular mailings, unlike those in this case, contained false or misleading statements or otherwise constituted separate deceptive acts"). It is alleged that these statements were fundamental to the scheme and likely to be issued on a regular basis during the life of the 15 year midstream services agreement. Because the alleged fraudulent activity associated with the creation of these royalty statements is likely to continue well into the future, the Court concludes that the FAC has sufficiently pled the existence of a pattern of racketeering

24

activity that carries with it a continued threat of on-going criminal activity. As such, defendants' motions to dismiss will be denied on this basis.

To be actionable, however, a RICO scheme also requires an actual injury that is the proximate cause of the racketeering scheme. Plaintiffs allege simply they "had and continue to have sums withheld from their royalty on account of falsely inflated, unauthorized post-production costs by reason, and as a direct, proximate, and foreseeable result, of the scheme alleged." (FAC ¶ 94.) Defendants complain that the existence of "inflated" deductions is conclusory and point out that plaintiffs have not alleged their royalty payments were reduced following the institution of the fraudulent scheme in 2012. Plaintiffs' response is confusing:

> [I]t is not necessary that Plaintiffs' deductions change as a result of the scheme. Plaintiffs allege that "Chesapeake was using its subsidiaries to artificially inflate deductions charged to lessors" when it created Access Midstream. Am. Compl. at ¶ 22. If these artificially inflated deductions were already inflated to such a level that Access Midstream would receive the desired return on their loan back to Chesapeake, then no new agreement or change in deduction amounts would be required. However, such facts can only be unturned through discovery.

(Opp'n Chesapeake MTD at 370.)

Plaintiffs cannot have it both ways. If the deductions from plaintiffs' royalty payments were already inflated *before* Chesapeake spun off its assets to Access Midstream, the proximate cause of their injury was not the scheme alleged in the FAC. Plaintiffs' alleged fraudulent scheme relies on the series of asset sales, beginning in 2012, and the gathering agreements that followed. (*See, e.g.*, FAC ¶¶ 31-38, providing that asset sales and gathering agreements led to the inflated deductions.) As set forth above, the factual allegations pertaining to the RICO claim in the FAC all relate directly to this particular scheme, not an unpled scheme that pre-dated the spin-off of Chesapeake's midstream assets to Access Midstream.

However, the question of whether plaintiffs can *prove* that their injury was the result of

the pled RICO scheme, and not some other fraudulent scheme that pre-dated the creation of Access Midstream, will be left for another day. Plaintiffs' factual allegation that the pled RICO scheme resulted in inflated deductions (and, by implication, lower royalty payments) is sufficient to set forth a RICO injury. Defendants are on notice as to the nature of the injury that plaintiffs allege flowed (and continues to flow) from the pattern of racketeering. Defendants' argument that the allegation is conclusory is really an attempt to require plaintiffs to prove the extent of their injury at the pleading stage. *See generally, Condor Am., Inc. v. Am. Power Deve., Inc.*, 128 F.R.D. 229, 232 (S.D. Ohio 1989) (a civil RICO plaintiff need only plead the circumstances surrounding the fraud with particularity, not the evidence of it) (citation omitted). To impose such a burden at this stage would be especially onerous here where most of the information regarding the deductions, including documents detailing defendants' actual midstream costs, are exclusively in defendants' control.

With that said, it bears noting that, for the RICO claim to survive, the  plaintiffs must prove damages proximately caused by the RICO scheme. That Chesapeake has alleged inflated deductions were already in place appears to undercut their RICO claim. Indeed, at this point, plaintiffs' alleged RICO claim stands in sharp contrast to the RICO claim pled in a related action pending in the Middle District of Pennsylvania. In *Suessenbach Family P'ship v. Access Midstream Partners, L.P.*, Civil Action No. 3:14-1197, 2015 WL 1470863 (M.D. Pa. Mar. 31, 2015), Pennsylvania mineral rights owners brought virtually identical claims against defendants, revolving around the same fraudulent scheme involving the creation of Access Midstream and the gathering agreements. With respect to their royalty payments, however, the plaintiffs were able to allege that specific royalty statements from late 2012 and beyond showed that deductions for post-production expenses were well in excess of the 12.5% permitted under the terms of their

specific lease agreements. *See id.* at *5-*6 (identifying complaint allegations regarding royalty statements showing deductions ranging from between 19% and 39% of the total royalty due). Plaintiffs have not alleged that their lease agreements contained a similar provision.

To survive summary judgment, plaintiffs will have to come forward with some evidence that, if believed, would support their claim that they suffered an injury as a result of the alleged RICO scheme. It will not be sufficient for them to rely on complaint allegations, or unsupported theories that any current injury is the same as injuries from prior, unsupported fraudulent schemes. For now, however, plaintiffs have satisfactorily pled a RICO claim.

### B.    RICO Conspiracy § 1962(d)

Plaintiffs also allege that defendants participated in a conspiracy to violate the substantive provisions of RICO. To plausibly state a claim for RICO conspiracy, plaintiffs must "successfully allege all the elements of a RICO violation, as well as alleging the existence of an illicit agreement to violate the substantive RICO provision." *Heinrich*, 668 F.3d at 411 (internal quotation marks and citation omitted); *see Salinas v. United States*, 522 U.S. 52, 65, 118 S. Ct. 469, 139 L. Ed. 2d 352 (1997). The Court has already determined that plaintiffs have successfully alleged all the elements of a substantive RICO violation.

However, Access Midstream argues that, even if a RICO scheme has been pled, plaintiffs have failed to allege that it joined the alleged conspiracy. (Doc. No. 19-1 at 290.) The Court disagrees and has set forth *supra* its findings that the FAC adequate alleges that Access Midstream committed two or more predicate acts. Moreover, while Chesapeake is credited in the FAC as devising the conspiracy scheme and setting the plan in motion, it is alleged that Access Midstream joined the conspiracy by agreeing to purchase the midstream assets at an artificially inflated price and then to charge inflated rates for midstream services to recoup the difference.

27

The Court finds that these allegations are sufficient to set forth a claim for RICO conspiracy under § 1962(d). *See United States v. Lawso*n, 535 F.3d 434 (6th Cir. 2008) (To violate § 1962(d), an individual need not agree to be the one who commits the predicate acts; they simply must agree to facilitate a scheme which, if completed, satisfies the elements of a RICO violation).

### C. State Law Claims

The FAC adequately pleads federal claims for RICO conspiracy and substantive RICO violations. Therefore, the Court is satisfied that it has subject matter jurisdiction over this action. Because many of the state law claims also sound in fraud and rely on the same allegations that form the basis for the RICO claims, the Court does not believe that it would be fruitful to parse through the requirements of each state law claim at this time. Thus, to the extent defendants' motions seek the dismissal of the state law claims, the motions are denied without prejudice. If appropriate, defendants may seek dismissal of the claims at the time set for filing dispositive motions.

### III. CONCLUSION

For all of the foregoing reasons, defendants' motions to dismiss are denied.

**IT IS SO ORDERED**.

Dated: March 23, 2016

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**